UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| QIAN YE, | ) |
| Plaintiff, | ) |
| v. | ) Civil Case No. 17-cv-1332 (TSC) |
| OFFICE OF THE SENATE, SERGEANT AT ARMS | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Qian Ye brings this suit for discrimination based on national origin, race, and sex pursuant to the Congressional Accountability Act, 2 U.S.C. §§ 1302(a), 1311(a), which applies Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, to offices in the legislative branch. Defendant Office of the Senate Sergeant at Arms (SAA), has moved for summary judgment. For the reasons set forth below, the court will GRANT SAA's motion.

I. BACKGROUND

Ye, a former SAA employee and woman of Chinese origin, alleges that SAA suspended her for one week without pay and ultimately terminated her employment because of her national origin, race, and sex.[1] Am. Compl. ¶¶ 71–80, ECF No. 16. Ye claims that her co-worker and team lead, Cris Benge, "begged management to get rid of [her] because he was uncomfortable working with someone who was not white." Opp'n to Mot. for Summ. J. at 17, ECF No. 35. Ye

---

[1] Ye brings two discrimination claims: one regarding her suspension, and one regarding her termination. Because both employment actions arise out of the same set of facts and the substantive analysis is the same for both, the court will treat the claims as one.

1

admits that no SAA supervisor made a disparaging comment in her presence about her national origin, race, or sex, Pl.'s Resp. to SOF ¶ 13, ECF No. 35-1, but points to several instances that she claims show Benge's discriminatory animus towards her, Opp'n to Mot. for Summ J. at 15–19. SAA, however, claims that it suspended and terminated Ye because of her continuous acts of insubordination.

### A. Employment Background and Reporting Structure

Ye began working for SAA on July 21, 2014 as a Senior Systems Engineer, responsible for maintaining and supporting SAA's SQL databases.[2] Def.'s SOF ¶¶ 1, 3–4. Benge began working at SAA in August 2015 as a Principal Systems Engineer, and was also appointed as the team lead, responsible for project planning and giving direction to Ye. *Id.* ¶¶ 18, 23–24. Ye and Benge comprised the SQL team, which was a part of the Enterprise Database Support group ("EDS"). *Id.* ¶¶ 6, 14–18. At all relevant times, Bryan Steward was Ye's second-line supervisor and Jay Moore was her third-line supervisor. *Id.* ¶¶ 8, 12. Chris Molander was Ye's first-line supervisor until late July 2016, when he took indefinite medical leave. *Id.* ¶¶ 7, 9. According to SAA, Steward became Ye's first-line supervisor at that time. *Id.* ¶ 11. Ye claims that Anthony Golding was her acting supervisor for several weeks before Steward became her interim first-line supervisor. Ye Dep. 22:12–23:19, Ex. 1, ECF No. 36-1.

### B. Alleged Discriminatory Animus

Ye alleges that Benge harbored discriminatory animus towards her, based on his complaints to management and human resources department (HR) about her, criticism of her

---

[2] Structure Query Language (SQL) is a computer programming language, and Microsoft SQL Server is "a relational database management system used for the structured storage of information." Def.'s SOF ¶¶ 4–5, ECF No. 28.

2

written communications, and comments he made in an e-mail exchange between himself and another SAA employee. *See generally* Opp'n to Mot. for Summ. J.

1. Benge's Complaints to Management and HR

Ye claims that in complaints to management and HR, Benge "falsely accused her of misconduct and unprofessional behavior."[3] Opp'n to Mot. for Summ. J. at 15.

Sometime in or around June 2016, Benge filed an HR complaint against Ye, in which he claimed that Ye (1) challenged team decisions and implemented changes contrary to those decisions; (2) temporarily removed Benge's access to certain systems and failed to properly communicate with the team within the last year; and (3) called Benge insulting names such as "SQL Master," "flim flam man," "liar," and "lawyer." Ex. 23, ECF No. 36-23. HR conducted an investigation and concluded that Ye's conduct was "unprofessional . . . [but did] not constitute harassment or a hostile work environment." *Id.*

2. Criticisms of Ye's Written Communication

Ye claims that Benge "repeatedly made fun of [her] grammar and written communication." Opp'n to Mot. for Summ. J. at 17–19. For example, in July 2016 Benge and a colleague, Sharif Akand, had an instant message conversation about Benge's intended resignation. Ex. 25, ECF No. 36-25. Akand told Benge that Ye informed him by e-mail that "he resigned" without specifying who she was talking about, to which Benge responded "oh, she didn't specify any context? World class communicator, that one." *Id.* Benge testified at his deposition that he had also criticized Ye's written communication skills when her understanding

---

[3] Ye also alludes to an e-mail in which Benge told Moore he was resigning because of Ye but cites only to an unrelated exhibit. Opp'n to Mot. for Summ. J. at 16.

3

of comma usage led to an incorrect understanding of an error message. Benge Dep. 104:10–105:3, Ex. 5, ECF No. 36-5.

### 3. Garrison's E-Mail to Benge

Finally, Ye points to a September 12, 2016 e-mail exchange between Benge and Richard Garrison in which they discussed Benge's difficulties with Ye and Garrison's difficulties with another female Asian employee named Dung.[4] Opp'n to Mot. for Summ. J. at 16; Ex. 17, ECF No. 36-17. Benge wrote "I really don't see [management] terminating her, and if she were going to choose to leave she likely would have already given everything that's transpired against her position." Ex. 17, ECF No. 36-17. Ye contends this comment indicates that Benge tried to force her to quit. Opp'n to Mot. for Summ. J. at 11, ¶ 60. In his response to Benge, Garrison wrote "[s]ome things are inherently cultural, but I believe a lot that you and I are dealing with are more character basic things that were never addressed throughout [Ye and Dung's] life." Ex. 17, ECF No. 36-17.

**C. Ye's Alleged Insubordination**

SAA counters Ye's claims of discriminatory animus by pointing to four instances of her alleged insubordination that it says were part of a pattern that led to her suspension and ultimate termination. *See* Mot. for Summ. J, ECF No. 28.

### 1. EDS Group Meeting and Counseling Memorandum

On June 14, 2016, Ye, Benge, and Molander attended an EDS group meeting. Def.'s SOF ¶¶ 25–26. Ye began to speak about a technical disagreement between her and Benge and tried to get Molander to vote on the resolution to a technical issue that had previously been

---

[4] Ye identifies Garrison as the Enterprise Storage Supervisor but does not explain Garrison's professional role in relation to herself or Benge.

debated at length. *Id.* ¶¶ 28–30. Though Ye claims that management had not yet made a decision, Pl.'s Resp. to SOF ¶ 29, Benge *had* already made a technical decision on the issue, and SAA contends that Ye tried to get those present at the meeting to overrule Benge's decision, Def.'s SOF ¶ 30. Molander told Ye that discussing the issue was inappropriate at the EDS meeting, and that "she should defer the discussion until the SQL-team only meeting scheduled for later that day." *Id.* ¶ 31. SAA claims that Molander asked Ye to defer the conversation three times, and she refused to do so until his third request. *Id.* ¶¶ 31–36. According to Ye, Molander "interrupted her, banged his hands on the table, and yelled, "'Stop, stop, stop!'" Pl's Resp. to SOF ¶ 31. Ye also claims that she did not know about the SQL-team only meeting scheduled for later and that Molander later admitted that he had not yet invited her to the meeting. *Id.* ¶¶ 31, 37.

Later that day, Molander verbally counseled Ye about her behavior during the meeting, and on June 20, 2016, Steward delivered a written Counseling Memorandum to Ye that was partly based on her insubordinate behavior during the June 14 meeting and warned her that further failure to follow orders could result in disciplinary action. Def.'s SOF ¶¶ 37–38, 45. Ye denied any wrongdoing or insubordination. Pl.'s Resp. to SOF ¶ 44. The Counseling Memorandum instructed Ye to "[s]upport and abide by the technical decisions made by [her] team lead," and to "not continue to debate or express [her] disagreement once [she] has provided [her] input and technical decisions are made." Ex. 6, ECF 30-6.

2. <u>Unauthorized Changes to Folder Paths During Data Migration</u>

That summer, as part of SAA's migration of data from one storage solution to another, Benge decided to clean up an inconsistency he believed existed in some folder paths and informed Ye of his plan for doing so. Def.'s SOF ¶¶ 46–51. Although Ye thought Benge's plan

5

was inefficient, according to SAA, the SQL team ultimately selected Benge's solution after discussion among Ye, Benge, and management. *Id.* ¶¶ 52–55. Ye denies that the SQL team selected Benge's plan. Pl.'s Resp. to SOF ¶ 55.

During Ye's employment at SAA, these types of changes were typically coded and tested in SAA's "development environments"—a set of SQL databases that does not support publicly accessible websites—before being implemented in the "production environment" —a set of SQL databases that supports publicly accessible Senate websites. Def.'s SOF ¶¶ 58–61. Benge implemented the changes in the development environment in May 2016, and Ye claims that these changes resulted in errors in the development environment. *Id.* ¶ 62; Pl.'s Resp. to SOF ¶¶ 62, 64. While Benge was out of the office, Ye was asked to migrate the data in the production environment. Def.'s SOF ¶ 65. According to SAA, Benge provided Ye with detailed instructions about the migration, but Ye and SAA disagree whether Benge instructed Ye to implement the same folder structure in the production environment. Def.'s SOF ¶ 66; Pl.'s Resp. to SOF ¶ 66.

On June 28, 2016, Molander approved Ye's work order ticket for the data migration in the production environment. Def.'s SOF ¶¶ 67–69. The ticket provided that "exactly [the] same folder structure will be used." *Id*. ¶ 68. The parties disagree whether Ye's work order ticket alerted Molander that she intended to implement her preferred folder structure, especially because Molander did not have a technical background. Def.'s SOF ¶¶ 70–72; Pl.'s Resp. to SOF ¶¶ 70–72.

On June 30, 2016, Ye migrated the data in the production environment using her preferred folder structure, without Benge's authorization. Def.'s SOF ¶ 73. Ye claims that she

did not seek Benge's authorization because he was on vacation and because Molander had already approved the work order ticket. Pl.'s Resp. to SOF ¶ 73.

On July 1, 2016, without submitting a work order ticket or seeking approval from Benge, Ye also implemented her preferred folder structure in the development environments, erasing the folder structure Benge had previously implemented. Def.'s SOF ¶¶ 74–75. Ye claims that she did not need to notify Benge that she had implemented her preferred changes and that no one told her not to change the folder structure in the development environment. Pl.'s Resp. to SOF ¶¶ 76–78.

According to SAA, after Benge discovered the changes Ye had made, he told Molander that he had not been informed of the changes, and they had not been tested before their implementation. Def.'s SOF ¶¶ 85–86. On July 13, 2016, Molander e-mailed Steward that he had not approved Ye's changes, that "[Ye] decided to do this behind [Benge's] back," and that this action "does go back to the insubordination actions that have been an issue." Ex. 23, ECF No. 30-6. That same day, Molander told Ye that she should not have deviated from Benge's instructions without first discussing her actions with her team and without getting approval. Def.'s SOF ¶ 88. A few days later, Steward told Ye that she must follow the technical decisions made by Benge, her team lead, and notify him before deviating from approved procedures. *Id.* ¶ 89.

### 3. Re-enabling the SQL Audit Feature and Suspension

Another incident of alleged insubordination concerns SAA's SQL Audit feature, which tracks and creates logs of different events in the server. Def.'s SOF ¶¶ 90–98. Due to a high number of system audit failures that summer, Benge asked Ye for input on how to fix the technical issue. *Id.* ¶¶ 90–91. On July 15, 2016, Benge proposed disabling the SQL Audit

7

feature while the team figured out how to fix the problem, and Ye responded that she was "fine" with this plan. *Id.* ¶¶ 91, 95. After receiving authorization from management and explaining the decision to Ye and others, Benge disabled the SQL Audit feature and again reminded Ye on July 18, 2016 that the feature had been temporarily disabled. *Id.* ¶¶ 96–97.

According to Ye, Benge was not at work on July 21, 2016 and Golding, her acting supervisor, told her Benge had resigned. Ye Decl. ¶ 26, Ex. 2, ECF No. 36-2. On July 25, 2016, without authorization, Ye re-enabled the SQL Audit feature, though she claims that she did not need authorization to make this change. Def.'s SOF ¶ 98; Pl.'s Resp. to SOF ¶ 98. Ye claims she re-enabled the SQL Audit function in response to a system crash and informed Golding that she had done so. Ye Decl. ¶¶ 27–29. However, Ye admits that she did not inform Golding of her changes to the system until *after* she had implemented them, even though she had previously been instructed to get approval before deviating from established procedures. Ye Dep. 226:7–227:1, Ex. 1, ECF No. 30-6.

As a result of this incident and her earlier unauthorized changes to folder paths during the data migration, Ye was suspended for a week without pay. Ex. 7, ECF 30-6. The Suspension Memorandum, signed by Steward, specifically outlined these two incidents as acts of "continued insubordination" and reiterated that Ye must follow the technical decisions made by the team lead and notify her team lead and/or supervisor and seek approval before deviating from previously approved technical procedures. *Id*. Ye denies engaging in any insubordination. Pl.'s Resp. to SOF ¶ 99.

4. Failure to Make Changes to Database Creation Tool and Termination

On September 2, 2016, after Ye had returned from her suspension, Benge asked Ye to make a change to a database creation tool, and Ye agreed to make the change. Def.'s SOF

8

¶¶ 105–09. Ye claims that she asked Benge for additional guidance on how to make the change and he refused to give her any guidance. Pl.'s Resp. to SOF ¶ 107. After Ye and Benge e-mailed back and forth for several days, Ye still had not implemented the change, and Benge asked Steward to step in. Def.'s SOF ¶¶ 111–13. On September 8, 2016 Steward e-mailed Ye, instructing her to follow Benge's directions, and met with her to discuss the issue. *Id.* ¶¶ 114–15. According to SAA, Ye still had not made the requested change, so Benge made the change himself. *Id.* ¶ 116.

Around this time, Benge also asked Ye to remove a function of the same database creation tool that saved backup copies of databases. *Id.* ¶ 117. According to SAA, instead of removing the portion of the code Benge had requested, Ye simply "commented out" the code, meaning that the code would not execute but was not deleted. *Id.* ¶¶ 120–21. Ye denies this and claims that she did remove the code, though this contradicts her deposition testimony in which she said that she first hid the code, then commented it out, which did not remove it. Pl.'s Resp. to SOF ¶ 119; Ye Dep. 281:8–16, 288:5–289:5, Ex. 1, ECF No. 30-6. According to SAA, after Ye's continued refusal to do so, Benge removed the code himself on September 13, 2016. Def.'s SOF ¶ 123.

That day, Benge e-mailed Molander and Steward explaining what had transpired, claiming that Ye had subvert[ed] orders and instructions and "asking for whatever help you can offer to get this issue – and more generally, this behavior – on professional grounds [if possible]." Ex. 18, ECF No. 36-18 (brackets in original). Ye claims that these accusations were false. Opp'n to Mot. for Summ. J. at 15.

According to SAA, Steward and Moore decided that Ye's failure to follow Benge's instructions about the two requested changes to the database management tool were

"insubordinate and necessitated terminating her employment." Def.'s SOF ¶ 124. SAA terminated Ye on September 27, 2016 for "violating the Sergeant at Arms' Personal Conduct policy, [her] persistent insubordination, failure to follow instructions, and failure to perform [her] duties as directed by [her] supervisor and team lead." Ex. 19, ECF No. 36-19.

## II. LEGAL STANDARDS

### A. Summary Judgment Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quotation marks omitted). The nonmoving party, in response, must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation marks omitted).

In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### B. Title VII Standard

Title VII of the Civil Rights Act provides that employment decisions in the federal government must be "made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). The court analyzes Title VII claims under the familiar three-prong burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Ordinarily, under this framework, after (1) the employee proves a *prima facie* case of discrimination, (2) the burden shifts to the employer to provide a "legitimate, nondiscriminatory reason for its action," and, finally, (3) "the burden shifts back to the employee, who must prove that, despite the proffered reason, she has been the victim of intentional discrimination." *Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019) (citations and quotation marks omitted). However, where the defendant provides a legitimate, non-discriminatory explanation for its actions at the summary judgment stage, "the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis omitted). Instead, the court's focus is whether the plaintiff produced "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the [plaintiff] on [a prohibited basis]." *Id.*

### III. ANALYSIS

Because SAA produced an "adequate evidentiary proffer" to satisfy the second prong of the *McDonnell Douglas* framework, *see infra* III(A); *Figueroa*, 923 F.3d at 1087 (citation and quotation marks omitted), the court need not evaluate whether Ye made out a *prima facie* case. *See Brady*, 520 F.3d at 494. Thus, after the court briefly analyzes the second prong, the bulk of

its analysis will focus on the third prong of the *McDonnell Douglas* framework: whether Ye produced sufficient evidence for a reasonable jury to find that SAA intentionally discriminated against her on the basis of her national origin, race, and sex. *See Figueroa*, 923 F.3d at 1086 (citing *Brady*, 520 F.3d at 494).

### A. SAA Provided a Legitimate, Nondiscriminatory Reason for Its Actions

SAA has met its evidentiary burden under the second prong of *McDonnell Douglas*. *See id.* at 1087–88. The D.C. Circuit recently clarified four factors that, in most cases, determine whether an employer's evidentiary proffer is adequate: (1) "the employer must produce evidence that a factfinder may consider at trial (or a summary judgment proceeding)"; (2) if the factfinder believes the evidence, it "must reasonably be able to find that the employer's action was motivated by a nondiscriminatory reason"; (3) the "nondiscriminatory explanation must be . . . facially credible in light of the proffered evidence"; and (4) the evidence must present a "clear and reasonably specific explanation" such that the employee has "a full and fair opportunity to attack the explanation as pretextual." *Id.* (citation and quotation marks omitted).

First, because Ye has not objected to the admissibility of any evidence introduced by SAA in support of its motion for summary judgment, the court may consider this evidence. *Cf. Ali v. D.C. Gov't*, 810 F. Supp. 2d 78, 83 (D.D.C. 2011) ("Rule 56 allows a party . . . opposing summary judgment to object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." (citing Fed. R. Civ. P. 56(c)(2)) (quotation marks omitted)).

Second and third, a factfinder could reasonably find from the evidence that SAA was motivated by a nondiscriminatory and legitimate reason. *See Figueroa*, 923 F.3d at 1087. In this Circuit, insubordination is a "commonly asserted legitimate, non-discriminatory reason[] for

12

taking an adverse employment action." *Richardson v. Petasis*, 160 F. Supp. 3d 88, 118 (D.D.C. 2015). SAA provided undisputed evidence of Ye's insubordination. For example, without submitting a work order ticket or seeking prior approval, Ye implemented an unauthorized folder structure in the development environment, erasing the folder structure her team lead had previously implemented. Def.'s SOF ¶¶ 74–76. This is sufficient evidence of Ye's alleged insubordination—or at least management's belief that she was insubordinate—for a factfinder to reasonably conclude that these insubordinate acts were, in fact, the reason for her suspension and termination. On the same basis, SAA's stated reason for disciplining Ye is legitimate and facially credible.

Fourth and finally, SAA has presented a sufficiently clear and specific explanation such that Ye has had "a full and fair opportunity to attack [it] as pretextual." *See Figueroa*, 923 F.3d at 1088. SAA has provided specific instances of Ye's insubordination that align with the explanations Ye was given at the time of her suspension and termination, *see, e.g.*, Ex. 16, ECF No. 36-16; Ex. 19, ECF No. 36-19, which "fairly put the plaintiff on notice of what reasoning [she] must challenge." *See Figueroa*, 923 F.3d at 1091 (citing *Stewart v. Ashcroft*, 352 F.3d 422 (D.C. Cir. 2003)).

### B. Ye Failed to Prove that Her Insubordination is Pretext for SAA's Intentional Discrimination

Because SAA has produced a legitimate, non-discriminatory reason for Ye's suspension and termination, the burden reverts to Ye to produce sufficient evidence for a reasonable jury to find that (1) her alleged insubordination was not the real reason for the adverse employment actions, and (2) SAA intentionally discriminated against her on the basis of national origin, race, and sex. *See Brady*, 520 F.3d at 494. The type of evidence sufficient to show that an employer's explanation is pretext for discrimination is a "fact-sensitive inquiry," *Walker v. Johnson*, 798

F.3d 1085, 1092 (D.C. Cir. 2015), and the court should consider "all relevant evidence presented by the plaintiff and defendant," *Brady*, 520 F.3d at 495. Having done so, the court finds that Ye has not met this burden, and summary judgment must be granted to SAA because Ye failed to produce sufficient evidence for a reasonable jury to find that SAA's explanation for her suspension and termination is pretext for discrimination.

1. <u>Ye Fails to Prove that Insubordination Was Not the Real Reason for Her Suspension and Termination</u>

Although Ye presented evidence intended to counter SAA's allegations of insubordination, that is not the relevant inquiry at the summary judgment stage. *See Morris v. McCarthy*, 825 F.3d 658, 671 (D.C. Cir. 2016) ("[A] Title VII plaintiff cannot survive summary judgment merely by asserting that her employer made a bad decision."). "Title VII . . . does not authorize a federal court to become a super-personnel department that reexamines an entity's business decisions," *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (citation and quotation marks omitted), and a court "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive," *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citation and quotation marks omitted). Rather, the relevant inquiry is whether SAA honestly believed Ye was insubordinate and disciplined her based on that belief. *See Morris*, 825 F.3d at 671 ("[The plaintiff] must raise a genuine dispute over the employer's honest belief in its proffered explanation." (citation omitted)).

Ye first contends that her challenges to Benge's previous technical decision at the June 14, 2016 EDS group meeting were not insubordinate because (1) management had not yet reached a decision, and (2) she did not know about the SQL-team only meeting scheduled for later in the day. Pl.'s Resp. to SOF ¶¶ 29, 31, 37. However, because it is undisputed that management expected Ye to abide by the technical decisions of Benge, her team lead, the fact

14

that management had not made a final decision does not undermine management's honest belief that Ye was insubordinate when she challenged Benge's decision. *See* Ex. 13, ECF No. 36-13 (counseling memorandum stating the expectation that Ye "support and abide by the technical decisions made by [her] team lead"); Ex. 16, ECF No. 36-16 (suspension memorandum reiterating the expectation that Ye "support and abide by the technical decisions made by [her] team lead"); Ex. 19, ECF No. 36-19 (terminating Ye for "persistent insubordination, failure to follow instructions, and failure to perform [her] duties as directed by [her] supervisor and team lead"); *see also Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) ("[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (citation and quotation marks omitted)).

Ye next contends that her changes to the approved folder path structure in both the production and development environments during the data migration were not insubordinate because (1) contrary to Moore's deposition testimony, the SQL team had *not* selected Benge's preferred folder path, *compare* Def.'s SOF ¶ 55 *with* Pl.'s Resp. to SOF ¶ 55, (2) Benge's implemented changes resulted in many errors in the development environment, Pl.'s Resp. to SOF ¶ 64, and (3) she did not need Benge's authorization because he was on vacation at the time and Molander had already approved her work order ticket, Pl.'s Resp. to SOF ¶¶ 70–73. Because Ye provides no explanation or support for her denial that the SQL team had decided on Benge's plan, *see* Pl.'s Resp. to SOF ¶ 55, the court considers the fact undisputed and assumes that the team *had* made a decision, *see Grimes v. District of Columbia*, 794 F.3d 83, 92 (D.C. Cir. 2015) (noting that Fed. R. Civ. P. 56(e)(2) "allows a court to consider a fact undisputed if it has not been properly supported or addressed as required by Rule 56(c)" (quotation marks and alterations omitted)). Ye also provides no support for her contention that Benge's changes

15

caused system errors, so the court need not evaluate that explanation for her actions. *See* Pl.'s Resp. to SOF ¶ 64; *Grimes*, 794 F.3d at 92.

The parties dispute whether Ye's work order ticket alerted Molander that Ye intended to implement her preferred folder structure in the production environment, especially given that Molander did not have a technical background. *See* Def.'s SOF ¶¶ 70–72; Pl.'s Resp. to SOF ¶¶ 70–72. But even if Molander did understand Ye's intention, Ye still fails to rebut SAA's claim that management believed her actions were insubordinate. First, the work order ticket that Molander approved applied only to the production environments, and Ye did not submit a work order ticket for the changes she made to the development environments. *See* Def.'s SOF ¶¶ 67, 74–76. Ye claims that she did not need to notify Benge that she had implemented her preferred changes and that no one told her *not* to change the folder structure in the development environment. Pl.'s Resp. to SOF ¶¶ 76–77. She attempts to support these contentions by citing to portions of the Steward Deposition that (1) contradict her statement that she was not required to communicate with Benge about the change, Steward Dep. 40:04-22, Ex. 3, ECF No. 36-3, or (2) refer only to the June 14, 2016 meeting and not this incident, *see id.* 28:05–16. Therefore, even if Molander actually approved Ye's changes to the folder path structure in the production environment, Ye has provided no evidence to contradict SAA's assertions that she needed, but failed to seek, authorization for her changes to the development environment.

Further, Molander's July 13, 2016 e-mail to Steward clearly stated that Molander had not approved Ye's changes, that "[Ye] decided to do this behind [Benge's] back," and that this action "does go back to the insubordination actions that have been an issue." Ex. 23, ECF No. 30-6. Ye fails to show that show that she was not insubordinate in this instance, and, more

importantly, fails to undermine Steward's belief that she was insubordinate. *See Vatel*, 627 F.3d at 1247.

With regard to Ye re-enabling the SQL Audit feature, Ye again fails to rebut SAA's belief that she was insubordinate. Even if Ye had no need to notify Benge of changes to the system because she believed he had resigned, *see* Ye Decl. ¶ 26, Ye admits that she did not inform her acting supervisor, Golding, of her changes to the system until *after* she had implemented them, even though she had previously been instructed to get approval before deviating from approved procedures, *see* Ye Dep. 226:7–227:1, Ex. 1, ECF No. 30-6.

Finally, Ye fails to rebut SAA's belief that she was insubordinate in failing to make Benge's requested changes to the database creation tool. Her contention that she removed the code as Benge requested is contradicted by her own testimony that she first hid the code, then commented it out, which did not remove the code. Pl.'s Resp. to SOF ¶¶ 119–21; Ye Dep. 281:8–16, 288:5–289:5, Ex. 1, ECF No. 30-6. Moreover, Benge's September 13, 2016 e-mail to Molander and Steward states that Ye was "subverting" orders and instructions and "resisting" technical requirements. *See* Ex. 18, ECF No. 36-18. Ye claims these are false accusations but she fails to support this contention with any evidence beyond the e-mail itself. Opp'n to Mot. for Summ. J. at 15. Thus, Ye fails to produce evidence to rebut SAA's honest belief that she was insubordinate.

> 2. <u>Ye Fails to Prove that SAA Intentionally Discriminated Against Her on the Basis of National Origin, Race, or Sex</u>

Even if Ye had rebutted SAA's honest belief that she was insubordinate, she presents no evidence that would permit a reasonable jury to find that SAA suspended and terminated her because of Benge's alleged discriminatory animus. A plaintiff may attempt to prove pretext by:

17

> citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive.

*Walker*, 798 F.3d at 1092 (citing *Brady*, 520 F.3d at 495 & n. 3).

Here, Ye advances a cat's paw theory of Title VII liability. Opp'n to Mot. for Summ. J. at 14–20. She claims that Benge, not management, harbored discriminatory animus. *Id*. Under a cat's paw theory, "an employer may be held liable for discriminatory acts by a direct supervisor," who is not the final decisionmaker, if "[1] the supervisor performs an act motivated by discriminatory animus [2] that is *intended* by the supervisor to cause an adverse employment action, and [3] that act is a proximate cause of the ultimate employment action." *Morris*, 825 F.3d at 668 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)) (alterations omitted) (emphasis in original).

Ye attempts to prove that Benge harbored discriminatory animus against her by pointing to (1) Benge's criticism of her written communication, (2) comments made by Enterprise Storage Supervisor Richard Garrison *to* Benge about Ye and another Asian female employee, and (3) Benge's complaints to management and HR about Ye creating a hostile work environment. Opp'n to Mot. for Summ. J. at 15–19.

First, Ye fails to show that Benge's comments on her written communication are evidence of discriminatory animus. For example, in July 2016 Benge and a colleague, Sharif Akand, had an instant message conversation about Benge's intended resignation. Ex. 25, ECF No. 36-25. Akand told Benge that Ye informed him by e-mail that "he resigned" without specifying who she was talking about, to which Benge responded "oh, she didn't specify any context? World class communicator, that one." *Id.* Benge claims that he had also criticized Ye's

18

written communication skills when her misunderstanding of punctuation resulted in an incorrect understanding of an error message. Benge Dep. 104:10–105:3, Ex. 5, ECF No. 36-5. Neither instance is direct evidence of discrimination based on Ye's national origin, race, or sex. *See Jones v. Nat'l Council of YMCA of the USA*, 48 F. Supp. 3d 1054, 1102 (N.D. Ill. 2014) (finding that a supervisor's correction of an employee's grammar in front of employees "[did] not point directly to an unlawful racial animus").

Second, Ye directs the court to comments made by Garrison *to* Benge about Ye and another Asian female SAA employee. Opp'n to Mot. for Summ. J. at 11, ¶ 61. Even if Garrison's comments might be evidence of discriminatory animus on his part, that animus cannot be attributed to Benge by proxy.[5] *See Parker v. Nat'l R.R. Passenger Corp.*, 214 F. Supp. 3d 19, 26 (D.D.C. 2016) (finding that evidence that an individual's workplace paramour was overtly racist does not establish that the individual was racist).

Third, Ye claims that Benge's HR complaint about her was based on false accusations and is evidence that "he was uncomfortable working with someone who is not white." Opp'n to Mot. for Summ. J. at 15–17. This claim also fails because Ye does not support it with any evidence other than conclusory allegations and Benge's statements to HR and management outlining Ye's insubordination and how it led to his initial decision to resign. *See id.*; Ex. 18, ECF No. 36-18; Ex. 23, ECF No. 36-23. Further, HR investigated Benge's complaints that Ye was insubordinate, unprofessional, and called him insulting names, and concluded that, while her conduct did not constitute harassment or a hostile work environment, it was unprofessional. Ex. 23, ECF No. 36-23. Thus, she cannot rely on the conclusory allegation that Benge's HR

---

[5] Garrison wrote "[s]ome things are inherently cultural, but I believe a lot that you and I are dealing with are more character basic things that were never addressed throughout [Ye and Dung's] life." Ex. 17, ECF No. 36-17.

complaint proves his discriminatory animus to defeat summary judgment. *See Robinson v. Red Coats, Inc.*, 31 F. Supp. 3d 201, 213 (D.D.C. 2014) ("[C]onclusory allegations of discriminatory animus lacking any factual basis in the record are insufficient to defeat summary judgment.").

Because Ye fails to produce evidence of Benge's discriminatory animus towards her, the court need not proceed past the first prong of the cat's paw analysis to reach its conclusion that her claims cannot defeat summary judgment.

## IV. CONCLUSION

The court finds that Ye has failed to present evidence sufficient to establish genuine disputes of material fact regarding whether SAA discriminated against her based on her national origin, race, or sex, and that SAA is entitled to judgment as a matter of law. Therefore, the court will GRANT SAA's motion for summary judgment.

A separate Order will follow.

Date: July 25, 2019

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge